EDITH HOLLAN JONES, Circuit Judge:
 

 United Savings of Texas (“United Savings”) appeals the judgment of the district court, which in turn affirmed the bankruptcy court’s award to the Trustee of a substantial portion of the funds in four escrow accounts. The accounts were originally created to satisfy certain obligations of a prior borrower in connection with the financing, by United Savings’ predecessor, of the purchase of two nursing homes. Two principal issues are raised on appeal: whether the escrow funds were property of the debtor’s estate pursuant to 11 U.S.C. § 541, at the date of bankruptcy, and whether, when the Trustee sold the nursing homes covered by the original debt and was released from any obligation on the debt, the Trustee retained his rights in the escrow funds. Based on the facts of this case, we answer both questions in the affirmative and therefore AFFIRM the judgment of the district court.
 

 I. FACTUAL BACKGROUND
 

 The escrow agreements at issue originated in 1976, when the predecessor of United Savings, Parker Square Savings and Loan Association of Wichita Falls, Texas, issued its loan commitment to Truco Properties Inc. for two loans to finance Truco’s purchase of the nursing homes. Two paragraphs in the commitment letter constitute the only written agreement concerning the establishment of the escrow accounts.
 

 Truco opened the required reserve accounts and contributed the appropriate amount to each account with its monthly payments of principal and interest on each loan. In 1977, Truco sold the two nursing homes to Parkway Health Care, Inc., and on January 18, 1979, the homes were purchased by Associated Memorial Homes, a division of Missionary Baptist Foundation of America, Inc., the debtor in this case. The escrow accounts were transferred successively from Truco to Parkway and then to the debtor. From time to time, amounts were disbursed from the reserve and replacement escrow funds to reimburse the then-owner of the nursing homes for various capital expenditures. Each year, deposits in the tax and insurance escrow funds were disbursed to cover those expenses.
 

 At each successive transfer of the property prior to the sale in question, the preceding borrowers and guarantors agreed to remain liable on the debt. Each successive transfer was styled as an assumption of
 
 *504
 
 the underlying indebtedness. United Savings’ predecessor expressly consented to each successive transfer.
 

 In October 1980, Missionary Baptist and its subsidiaries filed a petition for relief under Chapter 11 of Title 11, United States Code. Robert B. Wilson was immediately thereafter appointed Trustee. The debtor, through the Trustee, continued to operate the two nursing homes until April 30, 1982, when each of them was conveyed by the Trustee to Jewell Enterprises, a general partnership.
 

 Jewell Enterprises assumed all loan obligations with United Savings, and the debt- or was released from all loan obligations.
 
 [1]
 
 United Savings consented to the transfer of the properties, and in the agreement expressing its consent, language that would have effected a transfer of the escrow funds was crossed out by the parties. The conveyance by Missionary Baptist to Jewell, with the express reservation of the debtor’s rights to the escrow funds, was duly noticed to the creditors of Missionary Baptist and approved by the bankruptcy court.
 

 At the date of Jewell’s purchase, the four escrow accounts totalled nearly $90,-000, including approximately $46,000 in the tax and insurance accounts and $43,000 in the replacement and repair accounts. The Trustee continued to fund the escrow accounts during the bankruptcy, and no amounts were withdrawn for capital improvements. The Trustee brought this action in bankruptcy court seeking to have United Savings turn over the unexpended balance of the accounts. The bankruptcy court found that the funds were the property of the debtor’s estate, a finding affirmed by the district court.
 

 II. ANALYSIS
 

 The Trustee’s claim to the escrow accounts depends upon their status as property of the debtor’s estate pursuant to 11 U.S.C. § 541(a)(1). Property of the estate comprises “all legal or equitable interests of the debtor in property as of the commencement of the case,” and is generally interpreted broadly in accordance with the statutory language.
 
 In re Goff,
 
 706 F.2d 574, 578 (5th Cir.1983). The nature and extent of the debtor’s interest in property is analyzed by reference to the applicable state law, here, that of Texas.
 
 Id.
 

 The commitment agreement, while tailored to meet the contemporary economic needs of the parties, nonetheless has its roots in the common law device, escrow. Accordingly, we review briefly the relevant elements of escrow law, developed by the Texas courts, for guidance in determining the nature of the debtor’s interest in the property at the time of bankruptcy. Texas courts hold that when a grantor executes an escrow agreement and deposits the subject matter into escrow, he retains legal title to the subject matter, with equitable title passing to the ultimate grantee.
 
 See Cowden v. Broderick & Calvert,
 
 131 Tex. 434, 114 S.W.2d 1166 (Tex.1938);
 
 Hudgins v. Krawetz,
 
 558 S.W.2d 131, 134 (Tex.Civ.App.—San Antonio 1977, no writ). The depositary in escrow, as agent of all the parties, has the absolute duty to carry out the terms of the agreement, including delivering the subject matter when the terms of the escrow have been fulfilled.
 
 Albright v. Lay,
 
 474 S.W.2d 287, 291 (Tex.Civ.App.—Corpus Christi 1971, no writ). The ultimate disposition of the subject matter to the grantor or grantee is determined by the terms of the agreement, upon fulfillment of the necessary conditions.
 
 Kell v. Gross,
 
 171 F.2d 715, 718 (5th Cir.1949),
 
 cert. denied,
 
 338 U.S. 815, 70 S.Ct. 55, 94 L.Ed. 493 (1942);
 
 Gambrell v. Tatum,
 
 228 S.W. 287, 289 (Tex.Civ.App.—Amarillo 1921, no writ).
 

 In Texas, then, an escrow agreement is treated as a contract between the parties.
 
 Cowden,
 
 114 S.W.2d at 1169;
 
 La Roe v. Davis,
 
 333 S.W.2d 222 (Tex.Civ.App.—Amarillo 1960, no writ);
 
 Campbell v. Bar
 
 
 *505
 

 ber,
 
 272 S.W.2d 750 (Tex.Civ.App.—Fort Worth 1954, writ ref’d n.r.e.). To ascertain the intention of the parties, a court will examine not only the nature and terms of the agreement, but also the circumstances attending the execution of the contract and the conduct of the parties themselves.
 
 Kell,
 
 171 F.2d at 717;
 
 Albright,
 
 474 S.W.2d at 291.
 

 The escrow agreement here, sparse in its terms, required borrower to make payment each month into a savings account at Parker Square for the purposes stated in the escrow, in accounts in the name of the borrower:
 

 Borrower
 
 throughout the life of the loan
 
 will pay into escrow at Parker Square an amount equal to Vi2th of the amount reasonably estimated by Parker Square to be the then current annual ad valorem taxes as well as for any other special assessments for the subject real and personal property. Such escrow shall not accrue interest.
 

 * * * * * *
 

 Borrower shall pay, in addition to the monthly ad valorem tax and fire and extended coverage insurance escrow,
 
 each month together with the principal and interest payments on the note for the life of the loan
 
 an amount into escrow for reserve for replacement and repair for items of a capital nature to the nature home. Such amounts shall be deposited in a regular savings account at Parker Square (to accrue interest for Borrower ...) ... subject to the joint (but not several) control of Parker Square and Borrower.... Such reserve fund shall be used as the need arises for replacement of worn out furniture, fixtures and equipment and any other major items of repair not covered by insurance ... (emphasis added).
 

 United Savings does not deny that Missionary Baptist held a contingent interest in the funds pursuant to state law at the date of bankruptcy. Instead, United Savings contends that the contingency, “life of the loan,” prevents Missionary Baptist from claiming any right to the funds, other than to any excess which may remain in the funds after the term of the original loan. The Trustee contends that the phrase refers solely to the duration of Missionary Baptist’s loan obligation to United Savings. We agree with the Trustee. The phrase appears twice in the escrow language. In its first appearance, “life of the loan” modifies the obligation of the borrower to make payments on the loan, but it does not control the borrower’s rights upon the expiration of his obligations under the loan. The second appearance of the phrase, however, links the payment of principal and interest on the loan with escrow funding obligations, indicating the coterminous nature of those obligations. From this language, we conclude that when the borrower ceased to make monthly payments, his duty to maintain an escrow account also ceased. The purpose of the escrow fund was coextensive with Missionary Baptist’s obligation on the debt.
 

 The conduct of the parties reinforces the Trustee’s position. With each transfer of the property prior to the purchase by Missionary Baptist, the escrow accounts were assigned to the next owner who undertook, under the terms of the contract, making payments to each account while he made payments on the loan. After Missionary Baptist purchased the nursing homes, Parker Square looked solely to Missionary Baptist for payment into the funds, and not to any of its predecessors. This was in accordance with standard real estate practice, as acknowledged by testimony of the loan officer at Parker Square who had handled the original loan:
 

 Q. But if the borrower sold the property and there was some disposition made of his loan, you’d have to account for that money to the borrower, would you not, in some fashion?
 

 A. Yes.
 

 Q. Whether it be credit on what he owed or if there was an agreement between the two parties that the seller would transfer the escrow accounts. There would have to be some disposition made, would there not?
 

 
 *506
 
 A. Yes.
 

 The language of the escrow agreement and the parties’ conduct bespeak an intention that the escrowed funds, owned by Missionary Baptist all the while, remain available for the protection of United Savings only so long as Missionary Baptist was liable on the debt. The bankruptcy court did not err in its conclusion,
 
 [2]
 
 although our analysis differs somewhat.
 

 United Savings additionally maintains that Tex.Rev.Civ.Stat.Ann. art. 852a, § 5.06,
 
 [3]
 
 which permits state-chartered savings and loan associations to require the establishment of escrow funds for taxes and insurance premiums, overrides any contractual arrangements by the parties themselves and authorizes the retention of funds as some sort of security device until the entire debt is discharged. On its face, the statute simply authorizes the escrow scheme which was actually adopted by the original lender and borrower and honored by their successors and neither permits retention of funds beyond the existence of the borrower’s liability on the loan nor controls the disposition of the funds when the property is transferred.
 

 Our analysis to this point finds Missionary Baptist entitled to recover the escrow funds, under state law, when its liability on the debt to United Savings was extinguished. United Savings cites bankruptcy authority which, it asserts, demonstrates that escrow accounts can never be property of the debtor’s estate.
 
 See In re Newcomb,
 
 744 F.2d 621 (8th Cir.1984);
 
 In re O.P.M. Leasing, Inc.,
 
 46 B.R. 661 (Bankr.S.D.N.Y.1985);
 
 In re Lenk,
 
 44 B.R. 814 (Bankr.W.D.Wis.1984),
 
 aff'd,
 
 46 B.R. 867 (W.D.Wis.1985). None of the cited cases supports this blanket proposition. First, each of them construed the parties’ rights in accordance with applicable state law and the terms of their contracts, as we have done. Second, in each of the cases, the contingency which would wipe out the debt- or’s interest in an escrow fund occurred prior to bankruptcy. Hence, at the date of bankruptcy, no contingent interest existed which might accrue to the debtor’s estate. Where the contingency of the escrow was not fulfilled prior to bankruptcy, the debtor holds an interest in the property.
 
 In re Flannery,
 
 51 B.R. 697 (Bankr.S.D.Ohio 1985).
 

 The remaining issue, whether Missionary Baptist’s Trustee was entitled to return of the escrow funds when the homes were sold, is almost fully resolved by the previous discussion. The sale by the Trustee to Jewell was a tripartite arrangement in which United Savings specifically assented to the sale document whereby the Trustee reserved for Missionary Baptist’s estate and refused to transfer to Jewell, all rights in the escrow funds. Missionary Baptist was, concurrent with the sale, relieved and discharged from liability on the debt to United Savings. The purpose of the escrow funds had matured; therefore the Trustee properly, subject to proration of 1982 taxes and insurance to the date of sale, recovered the funds.
 

 Eightway Corp. v. Dime Savings of Williamsburg,
 
 94 Misc.2d 274, 404 N.Y.S.2d
 
 *507
 
 302 (N.Y.Civ.Ct.1978),
 
 aff'd,
 
 99 Misc.2d 989, 420 N.Y.S.2d 836 (N.Y.App.Div.1979), cited by United Savings, is not apposite. There, the plaintiff assumed a mortgage which required him to deposit moneys in escrow with the mortgagee bank for payment of taxes. The plaintiff subsequently sold the property without notifying the bank of the sale. The purchase agreement made no provision concerning the tax escrow account. When the next tax payment became due, the bank made the payment out of the pending escrow account, funded by the plaintiff. The plaintiff thereupon sued the bank and the purchaser to recover the funds. The court found that the bank’s payment of the taxes was proper, but held that the funds actually belonged to the plaintiff. Even though they were overlooked at the time of closing, the purchaser, if allowed to retain them, would have been unjustly enriched, and therefore had to pay them over to the plaintiff. Here, by contrast, the parties to the sale contractually provided in the sale agreement to Jewell that the funds would not be transferred. The equitable considerations here are even more compelling in the Trustee’s favor. The Trustee duly funded the escrow accounts up to the time of the conveyance to Jewell. As of April 1982, the amounts on deposit far exceeded the total annual liability of the debtor for the stated purposes. For United Savings to suggest that it be permitted to keep the excess for its benefit is inequitable. Second, if the escrow funds are restored to United Savings, Jewell would receive a de facto windfall. In the ordinary real estate transaction, Jewell would have purchased the escrow funds from the debtor by making an equivalent payment to the debtor. Here, no such payment has been made. We reject United Savings’ attempt to require the debtor to part with the funds for free.
 

 Finally, we address the Trustee’s contentions that the appeal to this court be dismissed because of United Savings’ tardy filing of its notice of appeal and motion to extend time to file an appeal in this district court from the judgment of the bankruptcy court. A district court may grant an extension upon a showing that failure to appeal timely was the result of excusable neglect or for good cause.
 
 Campbell v. Bowlin,
 
 724 F.2d 484, 488 (5th Cir.1984);
 
 Davis v. Page,
 
 618 F.2d 374, 377-78 (5th Cir.1980) (excusable neglect finding left untouched in subsequent history). A reviewing court will not disturb the district court’s ruling on the motion unless there has been an abuse of discretion.
 
 Id.
 
 United Savings filed its motion six days after the running of the ten day period prescribed in Bankruptcy Rule 8002. The delay occurred, according to United Savings, because of an indemnity agreement it held from Jewell, making it necessary that attorneys from both parties review the record and consult with each other and their clients before making a decision whether to appeal. In
 
 Davis v. Page,
 
 we deferred to the district court’s decision to grant an extension in a similar factual context. We decline to second-guess the district court’s approval of the extension here.
 

 For the foregoing reasons, we AFFIRM.
 

 [1]
 

 . The liability of prior transferors, if any, on the debt to United Savings was not an issue at the
 
 trial
 
 court or in this court.
 

 [2]
 

 . The bankruptcy court’s findings of fact will be accepted by this court unless they are clearly erroneous, and its judgment will be sustained unless based on an incorrect view of applicable law.
 
 Richmond Leasing Co. v. Capital Bank, N.A.,
 
 762 F.2d 1303, 1307-08 (5th Cir.1985); Bankr.Rule 8013.
 

 [3]
 

 . Article 852a, § 5.06 (1964) (amended 1985) provides, in pertinent part:
 

 Associations may require borrowers to pay monthly in advance, in addition to interest or interest and principal, the equivalent of one-twelfth
 
 (Vn)
 
 of the estimated annual taxes, assessments, insurance premiums, and other charges upon the real estate securing any loan, or any of such charges, so as to enable the association to pay same as they become due from the funds so received. The amount of such monthly charges may be increased or decreased as is necessary for the payment of same. Associations may carry such funds in trust in an account or may credit the same to the indebtedness and advance the money for taxes, insurance or other charges as they come due. Every association shall keep a record of the status of taxes, assessments, insurance premiums, and other charges on all real estate securing its loans and on all real and personal property owned by it.